IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

KENDRICK SALES, Individually,
WILLIAM E. WHITE, JR., Individually,
WAYNE TUBBS, JR., Individually,
And on Behalf of Others Similarly Situated                    PLAINTIFFS

v.                                        CIVIL ACTION NO.: 2:12-CV-00056-SA-SAA

JAMES BAILEY,
DELTA PRODUCTS TREE SERVICE, LLC,
And MS RIGHT OF WAY PROFESSIONALS, LLC                        DEFENDANTS

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs filed the present action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., seeking damages in the form of unpaid compensation. This Court subsequently commenced a three day bench trial on January 21, 2014. Following a thorough review of the evidence and applicable law, the Court is prepared to rule.

*Findings of Fact*

James Bailey has been an entrepreneur and small business owner for approximately thirty years. In 2003 or 2004, he opened Delta Products Tree Service, a residential tree clearing business, as a sole proprietorship. After gaining experience, Bailey set his sights on more lucrative public utilities right of way clearing contracts. He eventually landed separate contracts with both Centerpoint Energy and Entergy Services. Bailey signed a contract with Entergy on March 22, 2010, but did not start providing clearing services to Entergy until January 1, 2011.

Bailey conceded that, according to his understanding, he was the employer under the Fair Labor Standards Act for those working under his charge at least prior to March 25, 2011. Although Bailey was unable to provide start and end dates for any of the Plaintiffs, the evidence

established that John Lane, Jr., Adolfo Garcia, Gustavo Hernandez, Luis Hernandez, Gregorio Luna, and Homero Sanchez served under the employ of Delta Products Tree Service prior to that date.

Bailey argued that on March 25, 2011, however, he terminated all of his employees. Bailey contended that the terminations included both field workers and his office staff. Bailey contended that because of the inexperience and inefficiency of his workforce, he had fallen severely behind on Entergy's checkpoints for his progress, that Entergy was going to require him to redo a significant portion of the clearing without pay, and that Entergy had suspended any future disbursements until the work was deemed suitable. Bailey contended that in light of this setback, he decided to essentially shut down Delta Products' operations as a commercial right of way clearing business, and to merely subcontract the work out to another enterprise. According to Bailey, he met with his entire workforce on August 25, 2011 and informed them that their services would no longer be needed.

After that meeting, Bailey contended that Kennedy Harrell, one of his longtime foremen, proposed that he be allowed to form a partnership and pursue the subcontract opportunity. Several witnesses for Defendants testified that such a partnership was indeed consummated, and that it, as a matter of pure coincidence, consisted of all of Bailey's former employees. Bailey testified that the partnership was the brainchild of Harrell, and that he did not inquire into the specifics of with whom Harrell intended to partner. Again coincidentally, however, Bailey's daughters, Jaime Mitchell and Shekia Renea Dillon, who had previously worked in the office for Delta Products Tree Service, were additionally added as partners. Harrell, himself, however, who purportedly founded the partnership, was unable to recall with whom he had decided to

partner, citing the fact that it had been three years ago and that not all of the partners were in the courtroom.

On October 10, 2011, Bailey registered Delta Products Tree Service, LLC as a Mississippi limited liability company. According to Bailey's testimony, he was content with operating as a sole proprietorship, but the LLC was something that his youngest daughter "got [him] into." Less than a week later, on October 17, 2011, a number of the alleged Harrell partners registered MS Right of Way Professionals, LLC ("MS Right of Way") as a Mississippi limited liability company. According to Harrell, Bailey's daughter Shekia Dillon decided to form MS Right of Way as an LLC and he himself had nothing to do with the company's formation. According to Jaime Mitchell, however, the idea was conceived by both Harrell and Dillon. Shekia Dillon, Jaime Mitchell, Eddie White, Sr., Christopher Thomas, Adolfo Garcia, Homero Sanchez, Luis Hernandez, Andres Alverado, Janalisha Heard, Kenneth Jones, Kennedy Harrell, Randy Buckingham, David Camarana, Deon Ammons, Gustavo Hernandez, and Kendrick Sales were listed as members of the LLC. At the time of trial, Mitchell served as "manager one" for the LLC, her husband Nathaniel Mitchell served as "manager two," and Janalisha Heard served as the corporate secretary.

Ironically, despite the alleged amount of separation between the two companies, MS Right of Way Professionals, LLC and Delta Products Tree Service, LLC shared both the same address and phone number. Despite such shared resources, Defendants contended that Bailey had little to nothing to do with MS Right of Way, merely occupying office space down the hall. Mitchell, who at the time of trial served as MS Right of Way's "manager one," stated that MS Right of Way had only employed two employees during its entire existence. One of those purported employees, Janalisha Heard, was actually listed as a member on the certificate of

formation and then took the role as the entity's corporate secretary. Heard, who contended that she was responsible for keeping up with MS Right of Way's inventory, was asked to list examples of assets owned by MS Right of Way. According to Heard, the company owned chains, chaps, vests, gloves, and hats. Curiously, Heard made no mention of the trucks, chippers, and other large-scale implements that Nathaniel Mitchell cited as assets owned by the company.

Witnesses for Defendants further contended that the management structure for MS Right of Way was incredibly inclusive, that there were no bosses, and that the decisions on where to work, when to work, and how to work were reached by group vote. Defendants' witnesses claimed that no one had the power to fire employees because all individuals working for the company were members, and that no one had ever been fired. Defense witnesses contended that if they needed to hire someone, they first had to hold a member meeting to allow everyone to provide input. Essentially, all corporate decisions were purportedly made by the group of members at large. Several witnesses for the defense, including Jaime Mitchell, contended that the members' LLC agreement was embodied in a written operating agreement. That agreement, which Mitchell produced at trial, turned out to be nothing more than a PowerPoint presentation drafted after the commencement of the current lawsuit.

Further casting doubt on Defendants' theory of the case was the odd state of the records produced. The inconsistencies were in abundance, and the Court does not attempt to catalogue them in their entirety here. The most glaring examples, however, involved Defendants' production of Plaintiffs' payroll information. First, a number of checks issued after March 25, 2011, the date of the Delta Products Tree Service en masse lay off and Kennedy Harrell's formation of a partnership, continued to bear Delta Products Tree Service as the payor. Such

"mislabeled" checks continued to be issued even after the formation of MS Right of Way as well.

Defendant's Exhibit 4 and Plaintiff's Exhibit 3 both included check 900 issued to Plaintiff Gustavo Hernandez on September 16, 2011. With regard to the Defendant's exhibit, however, the check reflected that it had been issued by MS Right of Way. As to Plaintiff's exhibit, which had been furnished by Hernandez, the check reflected that it had been issued by Delta Products Tree Service. Mitchell, under oath, admitted that she had modified the check after the fact in an attempt to "correct the error." In her words:

> As I stated earlier, it was the exact—it was the same software. It was the same program. Once I noticed the errors—it's only an error in name. It's not to be malicious of any type. Once I noticed the error, I did change it. From that point, when you all requested our documents, if I noticed an error prior to receiving any type of litigation towards us, once I changed it, what I print out from my records, it will have the corrected.

Additionally, a number of Plaintiffs' paychecks reflected that federal and state taxes had been withheld even after Defendants claim to have formed a partnership and converted all employees to members and/or independent contractors. According to Defendants, such inconsistencies were also a software glitch and that, as agreed between the parties, the monies purportedly withheld as "taxes" were actually applied as "owner's equity" in the newly formed organization. Eventually, Defendants were able to correct the withholding line and began to uniformly withhold a portion of Plaintiffs' paychecks as a "membership fee."

Plaintiffs had no recollection of any group management meetings, much less a written operating agreement. Kendrick Sales and Thomas Brown, who were hired after Bailey had allegedly fired his workforce, testified that they were hired by Bailey, personally, rather than by group vote. None of the Plaintiffs who were purportedly members of the LLC ever remembered

having an organizational meeting to discuss management of the company. Instead, they testified that Bailey had been involved in the management of the company, regardless of its name, throughout their tenure. They testified that he had the power to hire and fire, and that the company ultimately answered to his authority. They did, however, recall a discussion about the "membership fees." According to the majority of Plaintiffs, Bailey had approached them with regard to the new deduction and had informed them that monies would be withheld from each paycheck, but that they would be applied toward an employer-sponsored "savings account."

Plaintiffs additionally testified in near unison that their average work hours were from approximately 6:00 or 6:30 in the morning until 5:00 or 5:30 in the evening. Plaintiffs recalled working overtime regularly, but did not recall ever being paid overtime. Thomas Brown, who was hired as a drag operator, testified that Bailey had told him at his hiring that "he didn't pay overtime, but [Brown] could work all of the hours [he] wanted."

After careful review, the Court determines that the organizational gymnastics of Delta Products Tree Service, MS Right of Way, and the unnamed partnership were nothing more than an elaborate charade, concocted in an attempt to avoid overtime obligations. The Court finds that Brown's testimony that Bailey simply didn't pay overtime is probably close to the truth. Throughout the trial, Bailey adamantly stated that he had never paid overtime and *almost* as adamantly stated that he had never paid overtime because overtime was never owed. On at least one occasion, however, Bailey equivocated as to that second assertion. The following exchange is illustrative:

> Q: But it's your testimony that, at no time, no laborer ever worked more than 40 while they were employed by you?
>
> A: That's correct. I kept an eye on that. I—the only time that I would ever consider—which I was always completing my work prior to this Entergy contract on time, but the only time I would

ever consider letting any worker go overtime is because I was behind on my work, which I never was.

When pressed with regard to the records for one particular worker who was not a party to this action, Bailey abandoned his theory that no worker had ever worked overtime:

> Q: Now, you didn't pay Randy Buckingham overtime that week did you?
>
> A: I don't know that you can establish that, because Randy Buckingham—obviously, he and I had some sort of agreement. He didn't choose to sue me.
>
> Q: Well, sir, look on the very next page, and you can see his rate is $10 an hour. If you take 455, which is what he made that week, divided by 10, it—guess how much hours it—take 455, divide by $10 an hour. That produces 45.5 hours. Do you see that?
>
> A: I see that.
>
> Q: You don't dispute that math, do you?
>
> A: No, but it don't say what agreement Randy Buckingham and I had over that amount either.
>
> Q: Well, assuming you employed Randy Buckingham in early of March 2011, and if he went over 40 hours in a workweek, he would have been entitled to time and a half, correct?
>
> A: Which was obviously paid.

At another point on direct examination, Bailey inadvertently dropped the façade on the separate corporate identities:

> Q: Did you set the individual rates of pay for anyone that worked for Mississippi Right of Way?
>
> A: I set the rates of pay when?
>
> Q: For any individual—
>
> A: For the year—what year are you talking about?
>
> Q: For 2011.

A: In 2011, I set the rate of pay from the start of the contract up until the end of the contract. After that, I didn't set a rate of pay.

Q: Okay. And what was that rate.

A: Well, it was—I call it rate. I mean, it's—you know, hourly pay, you know, is what I was doing.

Q: You mean—I'm talking about—you're talking about before March?

A: Before—

Q: Let me re—let me ask you the question again.

A: Okay.

Q: Have you ever set the rate of pay for anyone that worked at Mississippi Right of Way, any individual?

A: At what time?

Q: Anytime.

A: Oh, for Mississippi Right of Way?

Q: Right.

A: I'm sorry. I was thinking about—no, no, no. I never set a rate for Mississippi Right of Way, no.

The Court finds that Bailey continued to direct the operations of MS Right of Way even after it was formed as a separate legal entity. The Court discredits the testimony offered by Defendants that Delta Products merely provided maps for the work to be completed, and that the individual workers were then able to determine where to work and what tasks to perform without any further instruction from a superior. The Court accepts Plaintiffs' separate contentions that Bailey continued to supervise the operations and personally observed the progress they achieved. While the Court accepts that Bailey did indeed decrease his personal involvement out in the

field, the Court finds that he continued to pull the strings on MS Right of Way's operations. Particularly indicative of this fact was that MS Right of Way was consistently unable to put anyone on the witness stand who had an accurate grasp on the company's operations.

Kennedy Harrell, who was designated the corporate representative for MS Right of Way, was unable to recall with whom he had decided to form a partnership, and claimed to have had no involvement in the formation of MS Right of Way Professionals, LLC. Further, Harrell testified that all of the company's assets were obtained after March 25, 2011. Harrell gave no opinion as to how his partnership could have possibly operated from October 2011 until March of 2011 without any assets. Additionally, Harrell was unable to testify as to how the individual rates of pay for workers were reached, and made no mention of the maps that supposedly provided instruction for the laborers. Jaime Mitchell and Nathaniel Mitchell, managers one and two, were similarly unable to provide a clear picture of the decision making process at MS Right of Way.

Plaintiffs' employment history, including their hourly rates of pay, hours worked in a week, and employment start dates and end dates were difficult to determine given the lack of accurate employment records. The Court finds that as a matter of practice, Defendants routinely reverse engineered the pay records of numerous Plaintiffs to avoid the appearance of overtime work. Plaintiffs' hourly rates of pay were adjusted on a regular basis in an attempt to prevent from recording over 40 hours of work. In other words, if an individual worked over 40 hours, the plaintiff's hourly wage would be adjusted upward so that the employee would receive straight time for all of the hours worked, but he would receive no overtime wages. Defendants were unable to testify to start dates and end dates for any of the Plaintiffs, and wholly failed to produce a large number of relevant records.

In piecing together the Plaintiff's testimony and the few records that were made available, the Court makes the following findings:

1. Plaintiff Adolfo Garcia started performing brush work for Bailey on September 4, 2008. He continued to work for Bailey until October 17, 2011. From October 17, 2011 until June 15, 2012, Garcia worked for MS Right of Way. Garcia was initially paid $12.00 per hour, but eventually received a raise to $13.00 per hour.

2. Plaintiff John Lane, Jr. worked for Bailey from December 2010 until August 2011. Lane was paid $10.00 per hour.

3. Plaintiff Kendrick Sales worked for Bailey from August 2011 until October 17, 2011. From October 17, 2011 until his termination in March 2011, Sales worked for MS Right of Way. Sales was paid an hourly wage of $9.00 per hour. Sales was terminated by Bailey.

4. Plaintiff Thomas Brown worked for Bailey from late May 2011 until November 2011. Brown was paid an hourly wage of $18.50 until August 13, 2011 when he received an increase to $21.00 per hour.

5. Luis Torres-Hernandez worked for Bailey from March 11, 2011 until June 2012. He was paid between $11.00 an hour and $11.50 an hour. Torres-Hernandez returned to work at the end of 2013 and worked for MS Right of Way until the time of trial. At the time of his testimony, he was still employed by Defendants. At the time of trial, Torres-Hernandez was purportedly paid $106.00 per mile. Based on Jaime Mitchell's testimony that the workers could complete one mile of work in eight and a half hours, $106.00 per mile would equate to an hourly wage of $12.47.

6. Gregorio Luna worked for Bailey from December 5, 2010 until September 2011. Luna was paid between $12.00 per hour and $12.25 per hour.

7. Homero Sanchez worked for Bailey from April 2011 until June 2012. Sanchez was paid $11.00 per hour.

8. Gustavo Hernandez worked for Bailey from August 2009 until July 2012. He was paid $12.00 per hour. He did not work for MS Right of Way.

9. Eddie White worked for Bailey from August 2011 until April 2012. He was hired by Bailey. White was paid $11.00 an hour from August 2011 until October 2011, and was then given a dollar per hour raise from October 2011 until April 2011.

10. Wayne Tubbs, according to pay records entered into evidence, worked for MS Right of Way from at least November 2011 until March 2012.

11. Kenneth Jones, according to pay records entered into evidence, worked for Bailey from at least September 2011 until October 17, 2011. He continued to work for MS Right of way until at least December 2011.

The equipment used by Plaintiffs was almost entirely provided by Bailey and MS Right of Way. The companies owned all of the chainsaws, chaps, trucks, all-terrain vehicles, bobcats, trailers, and other implements used for the clearing work. The companies also provided the employees with personal protective equipment including hard hats and vests. The workers were issued such equipment free of charge, but had to pay for any replacements. The workers had no control over when or where they worked. Further, their hourly wage was dictated by Bailey and MS Right of Way, and they had little to no influence over the income they were able to earn in a week. The workers were hired on an indefinite basis, and few, if any, held outside employment.

*Conclusions of Law*

*A. Joint Employer Status*

Under the FLSA, an "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Whether an individual or entity is an employer similarly turns on the "economic reality" of the working relationship. Goldberg v. Whitaker House Co-op, Inc., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 100 (1961). The Fifth Circuit has articulated that the definition of employer is "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-à-vis its employees." Reich v. Circle C Investments, Inc., 998 F.2d 324, 329 (5th Cir. 1993) (citing Donovan v. Sabine Irrigation Co., 695 F.2d 190, 194 (5th Cir. 1983)). Further, if an "individual with managerial responsibilities is deemed an employer under the FLSA, the individual may be jointly and severally liable for damages resulting from the failure to comply with the FLSA." Lee v. Coahoma Co., 937 F.2d 220, 226 (5th Cir. 1991) (citing Donovan v. Grim Hotel, Inc., 747 F.2d 966, 972 (5th Cir. 1984)).

In making such a determination, the court should consider whether the purported employer: (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. Watson v. Graves, 909 F.2d 1549, 1553 (5th Cir. 1990); see also Itzep v. Target Corp., 543 F. Supp. 2d 646, 653 (W.D. Tex. 2008). Assuming there are no material facts in dispute, whether an individual or entity is a joint employer is a question of law. Itzep, 543 F. Supp. 2d at 653 (citing Karr v. Strong Detective Agency, Inc., 787 F.2d 1205, 1206 (7th Cir. 1986)).

In the case at bar, the Court determines that at all relevant times, Bailey acted as an employer of the Plaintiffs. First, he conceded that prior to the supposed termination of his employees on March 25, 2011 he was the employer. Second, the Court finds that he continued to act as the employer after that date, and that the formation of the informal Harrell partnership was nothing more than a sham. Finally, even after the formation of Delta Products Tree Services, LLC and MS Right of Way Professionals, LLC, the Court determines that Bailey still possessed the power to hire and fire employees, still set wages for the workers, and still had the ability to control the workers' hours worked and conditions of employment. The Court found it particularly revealing that when asked whether he had ever set rates of pay for MS Right of Way, Bailey felt it necessary to clarify which dates were at issue. Had Bailey actually had nothing to do with MS Right of Way, it seems that the answer would have been readily available. Additionally, the Court finds credible the statements of both Sales and White, who stated that they were hired by Bailey, and that he set their rates of pay. Accordingly, the Court determines that Bailey was the FLSA employer until the formation of MS Right of Way Professionals, LLC and Delta Products Tree Service, LLC, but that after that point, all of Defendants may be considered joint employers.

### B. Employee Status

In order to state a claim for unpaid wages or overtime under the FLSA, a plaintiff must first establish that he was an employee of the defendant. See Benshoff v. City of Virginia Beach, 180 F.3d 136, 140 (4th Cir. 1999) ("Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act."); Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986) (Under [the overtime provisions of the FLSA], however, a plaintiff must

also show that he was 'employed' by the defendant/employer in order to prove a violation."). Under the FLSA, "employee" is defined as "any individual employed by an employer," while "employ" means "to suffer or permit to work." 29 U.S.C. § 203(e)(1), 29 U.S.C. § 203(g). As observed by the Fifth Circuit, the definition is particularly broad and is intended to encompass "some parties who might not qualify as such under a strict application of traditional agency law principles." Hopkins v. Cornerstone America, 545 F.3d 338, 343 (5th Cir. 2008) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992)).

In order to gauge whether an individual is an employee or an independent contractor, the relevant inquiry is "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." Id. (citing Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 303 (5th Cir. 1998)). In making that determination, the court should consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. Hopkins, 545 F.3d at 343. No factor is sufficient or dispositive in and of itself; instead each should be considered in the larger context of the ultimate inquiry. Brock v. Mr. W Fireworks, Inc., 814 F.2d 1042, 1043-44 (5th Cir. 1987). Additionally, "[n]either contractual recitations nor subjective intent" can mandate a finding of employee or independent contract status. Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1315 (5th Cir. 1976). Accordingly, the Court analyzes the economic reality of the parties' relationship.

*A. Control*

In determining the degree of control exercised by the purported employer, the court should look to whether an individual exerts such control over a meaningful part of the business that she stands as a separate economic entity, or whether the alleged employer still controls the meaningful economic aspects of the business. See Hopkins, 545 F.3d at 343. The autonomy of the individual must be meaningful, as "the lack of supervision over minor regular tasks cannot be bootstrapped into an appearance of real independence." Id. (quoting Mr. W. Fireworks, 814 F.2d at 1049). Illustratively, the Fifth Circuit gave extensive consideration to the control prong in Hopkins. There, the question before the court was whether an insurance company's sales leaders, who were "primarily responsible for recruiting, training, and managing a team of subordinate sales agents," were properly considered independent contractors or employees. Id. at 342. Although the plaintiffs there had agreed to remain independent contractors and were able to maintain control over their day-to-day affairs, the company still retained significant authority over the business operations of the sales leaders. Id.

In weighing the control factor, the court examined such considerations as who had the authority to hire, fire, assign, and promote the leaders' subordinate employees, who had the authority to authorize advertisements for their subordinate agents, who had control over the type and pricing of products sold, who had control over the geographic area in which the agents could operate, and how many sales leads each sales leader could receive. Id. at 344. Finding that the company retained control over the vast majority of these variables, the Fifth Circuit found that because the company controlled "the meaningful aspects of the business model," the plaintiffs could not "plausibly be considered 'separate economic entities' and the control factor therefore weighed in favor of employee status. Id. (quoting Mr. W. Fireworks, 814 F.2d at 1049).

In the case at bar, the Plaintiffs controlled none of the meaningful economic aspects of the business. The Court completely discredits any testimony that the Plaintiffs participated in organizational meetings whereby they voted on business decisions. Further, the Plaintiffs were consistently under the supervision of a superior. Their hours, work location, and work methods were all dictated by either a supervisory foreman or Bailey, himself. Accordingly, the control factor clearly weighs in favor of employee status.

*B. Relative Investment*

As to the relative-investment prong, the court should compare the worker's individual investment to that of the purported employer. Id. at 344. The greater the investment made by the purported employer, the more likely the disputed party should be considered an employee rather than an independent contractor. Id. In the case at bar, the Court finds this prong clearly leans in favor of employee status. The putative employees made little to no investment in the business. The evidence revealed that although they may have purchased replacement personal protective equipment, the vast majority of the machinery and implements required to perform the right of way clearing work was owned by Bailey or MS Right of Way. Additionally, although the Plaintiffs indeed had a "membership fee" deducted from their paycheck issued by MS Right of Way, there was no credible evidence that Plaintiffs held anything more than an illusory interest in the company's equity. Defendants' argument that the parties operated as though the Plaintiffs held a legitimate ownership interest in MS Right of Way is simply unbelievable. That already tenuous assertion was further discredited by the fact that the Friday before trial, Mitchell and Heard filed paperwork with the Secretary of State to remove the Plaintiffs as "members" of the company. Accordingly, the investment prong weighs in favor of employee status.

*C.  Opportunity for Profit or Loss*

Turning to the degree to which the worker's opportunity for profit or loss is determined by the alleged employer, the court should analyze whether the worker or employer controlled the "major determinants of the amount of profit which the [worker] could make." Usery, 527 F.2d at 1313.  Whether such workers are paid on a commission or percentage basis is relevant, but not necessarily dispositive; instead, factors such as pricing of the service offered, service location, advertising, and customer volume should also be considered. Usery v. Pilgrim Equip. Co., Inc., 527 F.2d 1308, 1313 (5th Cir. 1976).  In Thibault v. Bellsouth Telecommunications, Inc., for instance, the workers were paid a set hourly rate, but were able to control their opportunity for profit or loss by controlling costs such as "repairs, supply costs, food, water, housing, etc."  612 F.3d 843, 848 (5th Cir. 2010).  As such, the Fifth Circuit determined that the factor weighed in favor of the plaintiffs' status as independent contractors.  Id.  Moreover, in Hickey v. Akra Industries, Inc., the Fifth Circuit found that where a salesperson's profits were determined by his ability to increase customer volume and he was allowed to sell other products, he was likewise an independent contractor.  699 F.2d 748, 752 (5th Cir. 1983).  Conversely, in Usery, the plaintiffs, who worked as dry cleaning operators, were paid a percentage of their sales volume, but the company retained control over the pricing of services, location of the sales area, and advertising.  527 F.2d at 1314.  Additionally, there was no risk of loss involved for the plaintiffs. Id.  The Fifth Circuit therefore concluded that "[n]o opportunity for loss of the capital investment in the [dry cleaning] station's operation and control by [defendant] of major determining factors of profit indicate that the operators are dependent upon [defendant], and therefore, that they are employees."  Id.

In the case at bar, the purported employers controlled the "major determinants of the amount of profit which the [workers] could make." Usery, 527 F.2 at 1313. The evidence revealed that the workers were paid a set hourly rate and that they could not control any of the costs of their work. The workers were not required to purchase supplies or repair equipment, and those costs were instead borne by Bailey or MS Right of Way. Additionally, the workers worked only as a crew, and they could not control the number of hours they worked. As such, the Court finds that this factor similarly leans in favor of employee status.

### D. Skill and Initiative

With regard to the skill and initiative required in performing the job, the court should look for some unique skill set. Carrell, 998 F.2d at 345. For instance, the court has before noted that "[p]ipe welding, unlike other types of welding, requires specialized skills." Id. at 333. "Routine work which requires industry and efficiency is not indicative of nonemployee status." Usery, 527 F.2d at 1311. In Herman v. Express Sixty-Minutes Delivery Services, Inc., the Fifth Circuit echoed its previous observation that "initiative, not efficiency determines independence." 161 F.3d 299, 305 (5th Cir. 1998) (quoting Mr. W Fireworks, 814 F.2d at 1053).

Here, the vast majority of Plaintiffs had no unique skill set. Although their work was certainly difficult and required efficiency, it did not require a specialized body of knowledge or training. That observation was underscored by the fact that several of the Plaintiffs came to the job with no previous training or experience in the clearing business, but were able to adjust to the requirements of the job in a fairly efficient manner. The evidence revealed that the workers primarily served as unskilled laborers, operating chainsaws, picking up debris, driving trucks and other equipment, and performing general landscaping tasks. Accordingly, as to Plaintiffs Sales,

White, Tubbs, Hernandez, Torres-Hernandez, Garcia, Sanchez, Jones, Lane, and Luna, the Court finds that this prong is indicative of employee status.

As to Plaintiff Brown, however, the Court finds that he indeed possessed a unique skill set. The evidence indicated that Brown had extensive expertise operating a drag line, which he described as a sixty foot boom with a Skil saw blade attached. Additionally, it was clear that few other workers were able to operate the machinery, and that Brown had failed to successfully train others to operate the equipment. As such, that factor weighs in favor of independent contractor status with respect to Brown.

## E. Permanency of the Relationship

Finally, in turning to the permanency of the relationship between the parties, the court should consider the temporal length of the relationship between the parties, with longer periods weighing in favor of an employer/employee relationship. Hopkins, 545 F.3d at 346. In Carrel, where the welders "moved from job to job, company to company, and state to state" for a six to nine month construction season, the Fifth Circuit found the situation indicative of an independent contractor relationship. 998 F.3d at 332.

Here, a number of the Plaintiffs worked for the Defendants for a multi-year period and were largely financially dependent on that relationship. They did not move from job to job, but saw their employment relationship as indefinite. White, Sales, Sanchez, and Luna, who worked for Defendants for shorter periods, did not take the jobs as short-term opportunities. They did not take the job as seasonal work, but similarly sought an indefinite employment relationship. With regard to those employees, the Court again finds that the consideration points toward employee status. As to Brown, however, the Court must once again draw a distinction. Somewhat curiously, the evidence revealed that he maintained his residence in Arkansas during

his employment with Defendants, indicating that he might have viewed the job as merely a short-term commitment. On the other hand, Brown too testified that he intended to stay at the job on a long-term basis, and that he only left because he was given fewer and fewer hours. On the whole, the Court finds that the permanency prong fails to point clearly in either direction with regard to Brown.

### F.  Employee Status Conclusion

On review, the Court finds that the economic realities of the relationship between the parties point heavily in favor of an employer/employee relationship. These Plaintiffs were not "in business for themselves," but were instead "economically dependent upon the alleged employer." See Hopkins, 545 F.3d at 343. Because with respect to most of the Plaintiffs the control, investment, opportunity for profit and loss, permanency, and skill and initiative factors all weigh in favor of employee status, the Court finds that those employees were indeed employees of Defendants for purposes of the FLSA. With regard to Plaintiff Brown, although an admittedly closer call, because the control, investment, and opportunity for profit or loss considerations weigh in favor of employee status, the Court similarly finds that Brown was also an employee for purposes of the FLSA.

### C. Damages

Having shown that they are indeed employees under the FLSA, in order to recover, Plaintiffs must establish that they performed work for which they were not compensated properly. See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946). "The FLSA requires any employee working over 40 hours in a week to be paid overtime, premium compensation at the rate of one and one-half times their 'regular rate' of pay." York v. City of Wichita Falls, 48 F.3d 919, 921 (5th Cir. 1995). The employee bringing a

suit for unpaid compensation bears the burden of proving, with definite and certain evidence, that such uncompensated work was performed. <u>Anderson</u>, 328 U.S. 680, 686-87, 66 S. Ct. 1187. That burden is easily satisfied where an employer is in possession of pertinent employment records. <u>Id.</u>; <u>See</u> 29 U.S.C. §211(c) ("Every employer subject to any provision of this chapter . . . shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him. . . ."), 29 C.F.R. § 516. Where an employer's records are inaccurate and inadequate, however, the employee may still discharge his burden by proving that he performed work for which he was improperly compensated by producing sufficient evidence to show the amount and extent of the work by "just and reasonable inference." <u>Id.</u>

As stated by the Supreme Court, when an employer fails to conform with its statutory duty to keep and maintain proper employment records, the solution "is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." <u>Id.</u> Instead, the Court should allow the plaintiff's claim to advance if he is merely able to show "that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." <u>Id.</u> The burden then shifts to the employer, who may negate the plaintiff's showing with evidence of the precise amount of work performed. <u>Id.</u> "If," however, "the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate." <u>Id.</u>

According to the Fifth Circuit, under such circumstances, the courts have "in effect ordered the fact finder to the do the best he could in assessing damages." <u>Reeves v. Int'l Tel. and Tel. Corp.</u>, 616 F.2d 1342, 1351 (5th Cir. 1980) (quoting <u>Mitchell v. Riley</u>, 296 F.2d 614, 616

(5th Cir. 1961)). An employer simply "cannot be heard to complain that damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of [§211(c)] of the Act." Donovan v. Grantham, 690 F.2d 453, 458 (5th Cir. 1982).

Here, the Court determines that Defendants failed to keep and maintain accurate employment records as statutorily required. Although Defendants did produce some records, there were large spans which were simply unaccounted for. Additionally, there was significant cause for concern as to the accuracy of the records that were produced. First, it was apparent that rates of pay had been adjusted in order to obfuscate the fact that overtime hours were being worked. Although Defendants testified that the workers worked more than one job and therefore received different rates of pay for different tasks performed, none of the Defendants were able to recall which jobs certain Plaintiffs were able to perform or recite specifically what type of job would receive precisely what rate of pay. And, although the Plaintiff's typically received a rounded hourly rate of pay, the adjusted rates of pay were often stated in odd numbers such as $12.62 or $13.49 per hour. Second, but just as troubling, was the fact that Mitchell testified that she had modified a number of the records after the fact. Although she stated that the modifications were not malicious and that she was simply attempting to correct any mistakes, such actions significantly call into question the veracity of those records. Accordingly, the Court determines that Defendants failed to accurately keep and maintain Plaintiffs' employment records and the Plaintiffs are entitled to rely on the relaxed burden articulated in Anderson, 328 U.S. at 686-87, 66 S. Ct. 1187.

Based on Plaintiffs' testimony, the Court finds that Plaintiffs did indeed perform work for which they were improperly compensated. After all, even Kennedy Harrell was unable to testify

that the workers had not been required to work in excess of forty hours per week to stay on schedule with the demands of the contract. Plaintiffs, on the other hand, convincingly testified that their approximate work hours were from 6:00 to 6: 30 in the morning until 5:00 to 5:30 in the evening with a thirty minute lunch break. Brown, on the other hand, succinctly testified that they worked approximately ten hours per day. As to the hours worked in a week, Plaintiffs testified that the typical workweek involved working in excess of forty hours, and that working less was the exception. Based on the evidence presented, the Court finds that Plaintiffs have established "the amount and extent of [their improperly compensated] work as a matter of just and reasonable inference" and that Defendants have failed to rebut that showing.

With regard to the workweeks for which employment records were produced, the Court is able to arrive at a fair calculation by dividing their gross pay for the pay period by their understood hourly wage. Based on the evidence presented at trial, that figure should represent a fair estimate of the hours actually worked. As for the weeks for which no records exist, the Court assumes that the Plaintiffs worked 45 hours per week. That estimation is based on Plaintiffs' testimony that they typically worked about ten hours per day, but that there work was heavily dependent on external factors and that there were certainly weeks in which they worked no overtime. Accordingly, the Court finds that overtime is owed as follows:

| Plaintiff | Overtime Owed Based on Produced Records | Overtime Owed for Weeks in Which No Records Exist | Total Overtime Owed |
|-----------|------------------------------------------|----------------------------------------------------|---------------------|
| Adolfo Garcia | $1231.02 | 85 weeks at $12.00 per hour.<br>85 weeks x ($12.00/2) x 5 = $2,550 | $3,781.02 |
| Gustavo Hernandez | $2,090.75 | 67 weeks at $12.50 per hour.<br>67 weeks x ($12.50/2) x 5 = $2,093.75 | $4,184.50 |
| Luis Hernandez | $1,525.74 | 1 week at $11.00 per | $1,553.24 |

| | | hour.<br><br>1week x ($11.00/2) x 5 = $27.50 | |
|---|---|---|---|
| Gregorio Luna | $75.60 | 1 week at $12.00 per hour.<br><br>1week x ($12.00/2) x 5 = $30.00 | $105.60 |
| Homero Sanchez | $981.37 | N/A | $981.37 |
| John Lane | $962.00 | N/A | $962.00 |
| Eddie White | $607.91 | 2 weeks at $11.00 per hour.<br><br>2 weeks x ($11.00/2) x 5 = $55.00 | $662.91 |
| Kendrick Sales | $361.83 | N/A | $361.83 |
| Thomas Brown | $848.53 | 2 weeks at $18.50 per hour.<br><br>2 weeks x ($18.50/2) x 5 = $92.50 | $941.03 |
| Wayne Tubbs[1] | $1,143.58 | N/A | $1,143.58 |
| Kenneth Jones | $134.48 | N/A | $134.48 |
| | Total | $14,811.56 | |

Notably, the Court adopts Plaintiffs' proposed findings with regard to the calculation of overtime owed on the face of the trial exhibits and additional overtime owed for week in which no records exist. With regard to Plaintiffs Gustavo Hernandez and Luis Hernandez, however, the Court finds that Plaintiffs' subtotals for each category only added to a total of $4,184.50 and $1,553.24, respectively. Accordingly, the Court's total sum of damages is slightly less than that

---

[1] Following the close of Plaintiffs' case, Defendants moved for a directed verdict as to Plaintiffs Kenneth Jones and Wayne Tubbs on the basis that they failed to appear and testify in this case. Plaintiffs countered by asserting that the Court had sufficient proof in front of it to issue a finding with respect to those two Plaintiffs even without their testimony. The Court instructed Defendants that it would defer ruling on the issue until the parties had an opportunity to brief the dispute. The Defendants failed to advance any further argument on the matter, and the Court therefore considers the motion and argument abandoned. See Keenan v. Tejada, 290 F.3d 252, 262 (5th Cir. 2002); Sanders v. Sailormen, Inc., 2012 WL 663021, at *3 (S.D. Miss. Feb. 28, 2012) ("Failure to address a claim results in the abandonment thereof.").

proposed by Plaintiffs.  In adopting Plaintiffs' proposed calculations, the Court concludes that Plaintiffs are owed $14,811.56 in damages.

## D. Liquidated Damages

Having concluded that Plaintiffs are indeed owed damages, the Court next considers whether a liquidated damages award is appropriate.  Under the FLSA, "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or an employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  Accordingly, the general rule is that "an employer who violates the overtime provisions is liable not only for the unpaid overtime compensation, but also for 'an additional equal amount as liquidated damages.'"  Singer v. City of Waco, 324 F.3d 813, 823 (5th Cir. 2003) (quoting 29 U.S.C. § 216(b)).  If, however, the district court determines that the employer acted in "good faith" and had "reasonable grounds" to believe that its actions complied with the FLSA, the court has the discretion to either reduce or eliminate the liquidated damages award. Id. (quoting 29 U.S.C. § 260).  Notably, though, the employer faces a "substantial burden" in proving such good faith and claims of ignorance alone are insufficient.  Id.; Reeves, 616 F.2d at 1353.

In the case at bar, the Court finds that Defendants have failed to carry their burden with regard to the "good faith" defense.  Instead, the great weight of evidence presented at trial indicated that after the company fell behind on the Entergy contract, Bailey could not pay his workers overtime and still return an acceptable profit.  Bailey testified that as a business owner it was ideal to prevent overtime, and that he had never paid overtime in the past.  Accordingly, Bailey sought to circumvent his obligations as an employer under the FLSA through the creation

of what was in practical effect a sham corporation. Although counsel for Defendants has argued that Bailey's actions were reasonable, the Court finds that they were nothing more than an elaborate ruse. Accordingly, liquidated damages in the amount of $14,811.56 are due.

### *E. Willfulness*

Under the FLSA, "[t]he issue of whether a particular violation was 'willful' determines the statute of limitations that applies to that violation." Singer, 324 F.3d at 821(citing 29 U.S.C. §255(a)). "If the violation was not willful, then a two-year statute of limitations applies to that violation." Id. "If the violation was willful, however, a three-year statute of limitations applies." Id. "The standard for determining willfulness is whether the employer either knew or showed reckless disregard for whether his conduct violated the FLSA." Reich v. Tiller Helicopter Serv's, Inc., 8 F.3d 1018, 1036 (5th Cir. 1993) (internal citation omitted).

On the present facts, the Court finds that, at a minimum, the Defendant's exhibited a reckless disregard for whether their conduct violated the FLSA. The Court finds that the Defendants sought to eliminate paying overtime through subterfuge, rather than through a legitimate business management endeavor. Because the Defendants magically deemed their employees "independent contractors" without changing any of the economic realities of the relationship, the Court finds that the violation was willful and that the three year statute of limitations applies.

### *F. Attorneys' Fees*

Finally, the FLSA authorizes an award of attorneys' fees to a successful plaintiff. Lee v. Coahoma County, 937 F.2d 220, 227 (5th Cir. 1991). Under 29 U.S.C. § 216(b), "[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant and the cost of the action." Because

Plaintiffs here are a prevailing party, the Court concludes that they are entitled to an award of reasonable attorney's fees and costs. Plaintiffs are therefore allowed thirty (30) days from the entry of this judgment to file a motion for attorney's fees and costs. Defendant shall thereafter be allowed fourteen (14) days in which to file a response.

*Conclusion*

Based on the law and the evidence presented, the Court finds that the Plaintiffs at issue here were employees, that James Bailey was the employer for purposes of the FLSA prior to October 17, 2011, that the Defendants operated as joint employers after October 17, 2011, and that the Plaintiffs are owed $14,811.56 in damages, $14,811.56 in liquidated damages, and reasonable attorney's fees and costs.

SO ORDERED AND ADJUDGED, this the 8th day of August, 2014.

**/s/ Sharion Aycock_____**
**U.S. DISTRICT JUDGE**